# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

ROBERT DILLON,

    *Plaintiff*,

v.

CITY OF JACKSONVILLE BEACH;        Case No. 2:26-cv-1936-JES-KRH
SCOTT O'CONNELL; JAMES WALTERS;
and T.K. WATERS, in his official capacity
as Sheriff of Jacksonville,

    *Defendants*.

_____/

## FIRST AMENDED COMPLAINT

### Declaratory and Permanent Injunctive Relief Requested

1. This case is about what happens when police let an error-prone artificial intelligence ("AI") system stand in for an investigation. A facial recognition algorithm flagged Robert Dillon as the man who tried to lure or entice a child under twelve years old at a Jacksonville Beach McDonald's. It was wrong. Mr. Dillon, a fifty-two-year-old resident of Fort Myers, had never set foot in Jacksonville Beach. But rather than test the machine's answer against the evidence that would have cleared him, the officers built a case to confirm it. Mr. Dillon was arrested and prosecuted for one of the most stigmatizing crimes a person can face.

2. Mr. Dillon lives more than 300 miles from Jacksonville Beach. He had no connection to the McDonald's, to the child who was targeted, or to anyone involved in the crime. He became a suspect for one reason: a facial recognition algorithm included him in a list of possible matches to a suspect captured on grainy

surveillance footage at the restaurant. The investigating officer treated that algorithmic output as a near-certain identification, omitted critical exculpatory evidence from his arrest warrant application, and failed to pursue routine investigative steps that would have immediately excluded Mr. Dillon as a suspect.

3.      The arrest warrant that deprived Mr. Dillon of his liberty was the product of a cascade of investigative failures by the lead investigator, Jacksonville Beach Police Department officer (now corporal) Scott O'Connell. Those failures included, among other things set forth in detail below, a complete failure to consider that the suspect was alleged to have been a "regular" customer at a McDonald's in Jacksonville Beach—a city located more than 300 miles from Mr. Dillon's home and a place that he had never been to in his life.

4.      O'Connell is an officer with a documented history of volatility and poor judgment, having previously been terminated from the St. Johns County Sheriff's Office for threatening to "blow up" the agency, later reinstated, then arrested for domestic battery before resigning under the weight of those charges. Jacksonville Beach PD hired him anyway, assigned him as lead investigator on a sensitive child-luring case, and later promoted him to corporal after his investigation resulted in the wrongful arrest and prosecution of an innocent man.

5.      The warrant application rested on three fundamentally defective components: (i) a misidentification generated by unreliable facial recognition software; (ii) a photo array tainted by a false match generated by that unreliable software and administered to a witness who did not see the underlying crime; and (iii) O'Connell's

2

deliberate omission of multiple categories of readily verifiable exculpatory evidence, known to O'Connell when he swore out the affidavit, as set forth below.

6.    Had the warrant application included the full set of facts—including but not limited to the low quality of the image fed into the facial recognition system (the "probe image"), the results of a query of a license plate reader database that indicated that Mr. Dillon's vehicles were not in Duval County on the days surrounding the McDonald's incident, the geographical impossibility of a Fort Myers resident being a "regular" at a Jacksonville Beach McDonald's, Mr. Dillon's vehement and credible denial, and a description of Mr. Dillon's distinctive physical features which differed from the suspect's—no reasonable magistrate would have found probable cause.

7.    Mr. Dillon was arrested at his home in front of his wife. He was accused of attempting to lure a child—a charge carrying devastating social stigma and permanent reputational destruction. He was held overnight in jail, forced to borrow money and pledge the title to his truck to post bond, subjected to months of criminal prosecution, and publicly branded with a mugshot that remained accessible online long after the charges were dropped. Community members still approach him in public to ask about the case. He no longer feels comfortable being friendly to children. No law enforcement agency has ever apologized or acknowledged the error.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, because this action arises under the Constitution and laws of the United States.

9.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of

3

the events giving rise to the claim occurred in this District.

## PARTIES

10.    Plaintiff Robert Dwayne Dillon is a fifty-two-year-old resident of Fort Myers. At all times relevant to the complaint, Mr. Dillon was self-employed as a commercial crabber.

11.    Defendant City of Jacksonville Beach is a Florida municipality. The Jacksonville Beach Police Department ("Jacksonville Beach PD") is one of its departments.

12.    Defendant Scott O'Connell was, at all times relevant to this Complaint, employed as an officer with Jacksonville Beach PD. He served as the primary investigator in the case resulting in Mr. Dillon's wrongful arrest and swore out the affidavit in support of the arrest warrant. He was promoted to corporal on December 3, 2024. O'Connell is sued in his individual capacity.

13.    Defendant T.K. Waters is the Sheriff of Jacksonville. He is sued in his official capacity. The Jacksonville Sheriff's Office ("JSO") is the law enforcement agency of the consolidated city-county government of Jacksonville and Duval County, where Jacksonville Beach is located. JSO has access to facial recognition technology systems, including the Face Analysis Comparison and Examination System ("FACES" or "FACESNXT"), the centralized facial recognition database maintained by the Pinellas County Sheriff's Office, and uses these systems to conduct facial recognition searches on behalf of its own investigations and in aid of partner agencies, including the Jacksonville Beach PD. Sheriff Waters is JSO's final policymaker with

respect to the use, quality control, and dissemination of facial recognition technology results, including results provided to partner agencies.

14.     Defendant James Walters was, at all times relevant to this Complaint, employed as a sergeant with JSO. Sergeant Walters was responsible for conducting or overseeing facial recognition searches on behalf of JSO and for transmitting results to requesting law enforcement agencies, including Jacksonville Beach PD. Walters is sued in his individual capacity.

**FACTUAL ALLEGATIONS**

    **I.     Facial Recognition Technology: Background**

       *a.  How Facial Recognition Technology Works*

15.     Automated facial recognition technology ("FRT") is a system powered by AI that is used by law enforcement to attempt to determine the identity of an unknown person by searching a large repository of images.

16.     FRT operates by reducing a facial image into modeled structures to generate unique digital codes called "templates," and then comparing templates derived from different images.

17.     To initiate a search using FRT, an operator inputs a "probe image" of the unknown individual.

18.     The system then detects the face, potentially performs preprocessing (resizing, enhancement), and converts the facial features into a mathematical template. Depending on the FRT system, this may be done automatically or with the assistance of a human operator.

19. The system compares the probe template to stored templates in a database, calculating a similarity score for each comparison.

20. The similarity score, sometimes called a "confidence score," is a measurement of digital proximity between two mathematical templates. Depending on the FRT system's design, similarity scores can be represented as a percentage, a number between zero and 1,000, or another numeric value. A confidence score is not a measurement of a probability that the two images depict the same person. For example, a 93% confidence score does not mean there is a 93% probability that the candidate is the suspect.

21. The system returns a candidate list of possible matches. In any candidate list containing more than one candidate, at best, all but one are false positives. Frequently, all returned candidates are false positives.

22. If a true match appears in the candidate list, it may not be the first result, and can even appear deep into the list. Depending on an FRT system's settings, a candidate list may contain dozens or even hundreds of faces.

23. If the actual suspect is not in the database, all returned candidates are necessarily incorrect, making the false positive rate 100%.

24. Each FRT algorithm has its own mathematical method of analyzing faces based on how the algorithm was designed and trained, making it difficult to determine precisely what the system is measuring or how it arrives at a particular similarity or confidence score.

6

### b. *The Critical Importance of Probe Image Quality*

25.     The accuracy of FRT results depends significantly on the quality of the probe image. Lower-quality images contain less interpretable facial data, degrading the system's ability to produce a reliable template.

26.     Factors that degrade reliability include: low resolution; low lighting; over- or under-exposure; face angled away from the camera (off-axis); shadows on the face; partial obstruction or occlusion; facial expressions; and image anomalies or distortions. Any one of these defects can render the results of an FRT search less reliable; a combination of multiple defects compounds the reliability problem.

27.     Training materials for the FACES system (which JSO has access to) acknowledge the limitations of facial recognition technology and identify conditions under which the technology produces unreliable results. Those materials place responsibility for the match determination on the end user without providing or requiring any procedural framework, numeric quality threshold, or guidance governing how that determination should be made.

28.     Images in the databases searched by FRT systems, which often include driver's licenses and mugshots, are generally well-controlled: subjects face the camera and are photographed under good lighting, with neutral expressions and unobstructed faces. Probe images collected by law enforcement and run through the FRT system, by contrast, are often pulled from surveillance cameras and exhibit significant irregularities. These asymmetries between probe and database images further degrade accuracy.

### c. The Phenomenon of Doppelganger Matches and Automation Bias

29.    FRT systems are designed to return the most similar-looking faces in a database. With a sufficiently large database, the likelihood of returning a lookalike—a "doppelganger"—is significant, even when the actual suspect is not in the database.

30.    In such a case, when FRT produces a false match, the returned (innocent) candidate will, by algorithmic design, resemble the actual perpetrator. Placing that candidate's photograph in an array predictably taints any witness identification that follows. Photo arrays are constructed by surrounding the candidate with "fillers" — photographs of known innocents selected for their physical similarity to the candidate, not to the actual perpetrator. But because the FRT-identified candidate was selected for resembling the perpetrator, that candidate will almost invariably be the closest visual match to the perpetrator. The fillers, chosen to resemble the candidate, will match the true perpetrator even less closely. When a photo array including an innocent candidate is shown to a witness, the witness's identification does not corroborate the FRT match; it merely repeats it. What looks like a second, independent identification is in fact the same algorithmic error surfacing twice, creating an illusion of confirmation that drives officers to treat the result as reliable.

31.    In more than half of the 15 known cases of wrongful arrests in the U.S. due to police reliance on incorrect FRT results, police presented a photo array to a witness, who incorrectly selected the false-match FRT-generated lookalike as the suspect.

32.    "Automation bias" occurs when a human reviewer is overly reliant on

technology-generated outputs, such that the technology usurps rather than supplements human professional judgment. A seemingly precise metric like a high similarity score conveys an unwarranted aura of scientific certainty, causing officers to substitute the algorithm's output for the required exercise of independent judgment.

33. On simulated FRT tasks, even professional facial examiners have shown average error rates of approximately 30%.

34. The risk of automation bias is amplified when the technology involved is an AI system whose internal decision-making processes are opaque even to its operators. In such instances, an officer presented with a "93% match" from an AI-powered system has no way to evaluate the basis for that score, no way to assess whether the system's confidence is warranted, and no frame of reference for understanding what "93%" actually means in probabilistic terms.

### d. The FACES System

35. FACES (also known as FACESNXT) is a facial recognition database operated by the Pinellas County Sheriff's Office. It provides biometric search capabilities through the Florida Criminal Justice Network.

36. As of 2022, FACES contained over 38.5 million images, including mugshots and Florida driver's license photographs.

37. As of 2022, at least 196 law enforcement agencies had access to FACES, including JSO.

38. FACES training materials promulgated by the Pinellas County Sheriff's Office acknowledge that "Poor Image Quality" affects the performance of facial

recognition.

39.    The Pinellas County Sheriff's Office stated that FACES training materials characterize FACES as "an investigative tool only" and that "[i]ndependent investigation is required to determine whether any person in a photo array return in the facial recognition system is the person who committed a crime."

### e.  Jacksonville Beach PD's FRT Policy

40.    Upon information and belief, Jacksonville Beach PD's only written policy on the use of FRT is General Order 401.14 ("Face Analysis Comparison and Examination System Next"), effective April 1, 2022.

41.    Jacksonville Beach PD's General Order states: "FACESNXT is an investigative tool and any law enforcement action taken based on a submission to FACESNXT will be based on the agency's own identity determination and not solely the results of the FACESNXT results. FACESNXT results are strictly investigative leads to assist with subject identification and/or verification."

42.    Despite this written policy, Jacksonville Beach PD's General Order provides no concrete guidance on the follow-up steps required to corroborate or exclude a facial recognition lead before seeking an arrest warrant. Nor does the General Order provide any guidance regarding use of or reliance on results from any FRT system other than FACES.

43.    The General Order contains no protocols governing: when or how probe image quality should be assessed; what independent corroborating evidence must be obtained before a warrant application; what kinds of independent corroborating

10

evidence must be obtained before proceeding to a photo presentation, how photo arrays should be constructed when the person of interest was identified through FRT; what disclosures about FRT limitations must be made to a magistrate upon an application for a warrant; or what supervisory review is required before submission of a warrant predicated on FRT. The General Order also contains no guidance regarding the factors that can render a FRT search unreliable, including angle, pose, lighting, resolution, or partial occlusion of a probe image.

### f. The Growing Pattern of Wrongful Arrests From FRT

44. By the time Officer O'Connell sought the arrest warrant for Mr. Dillon on July 31, 2024, a well-documented and growing pattern of wrongful arrests attributable to FRT had placed law enforcement agencies on clear notice of the technology's dangers.

45. In 2015, within Jacksonville's own law enforcement community, JSO detectives ran a poor-quality photograph through the FACES system, resulting in the arrest of Willie Allen Lynch for a fifty-dollar crack cocaine purchase. The algorithm expressed a low level of confidence, yet an analyst sent Lynch's photo and criminal history to officers, asserting he was the likely perpetrator. Lynch's case generated significant public attention regarding the reliability of FRT. Lynch maintained that the FACES system generated a false match, but he was denied access to sufficient pretrial discovery to mount a challenge to defects in the system and its use.

46. In July 2019, Detroit police falsely arrested Michael Oliver based on an incorrect FRT result followed by a tainted photo lineup. Oliver was held for three days,

and had to defend against prosecution for weeks before charges were dropped. His wrongful arrest suit, *Oliver v. City of Detroit*, No. 2:20-cv-12711 (E.D. Mich.), was publicly reported in July 2020.

47.    In January 2020, Detroit police wrongfully arrested Robert Williams based on an incorrect FRT result followed by a tainted photo lineup. Williams was detained for approximately thirty hours. His wrongful arrest, which generated a false arrest suit, *Williams v. City of Detroit*, No. 2:21-cv-10827 (E.D. Mich.), was publicly reported in June 2020, in national media outlets.

48.    In February 2019, Woodbridge, New Jersey police wrongfully arrested Nijeer Parks based on an incorrect FRT match followed by a tainted visual confirmation by an officer, despite Parks being miles away from the crime scene with a verifiable alibi when the crime was committed. Parks was incarcerated for ten days. His malicious prosecution suit, *Parks v. McCormac*, No. 2:21-cv-4021 (D.N.J.), was publicly reported in December 2020, in national media outlets.

49.    In March 2022, Maryland transit police wrongfully arrested Alonzo Sawyer based on an incorrect FRT result followed by a tainted visual confirmation by an officer. The case was reported in national outlets beginning in February 2023.

50.    In November 2022, Georgia police wrongfully arrested Randal Quran Reid on a warrant issued in Louisiana, based on an incorrect FRT result. Reid had never been to Louisiana. His wrongful arrest, which generated a malicious prosecution suit, *Reid v. Bartholomew*, No. 2:24-cv-2844 (E.D. La.), was publicly reported in January 2023, with further reporting in the New York Times in March 2023.

12

51. In February 2023, Detroit police wrongfully arrested Porcha Woodruff based on an incorrect FRT result followed by a tainted photo array. The wrongful arrest suit, *Woodruff v. Oliver*, No. 5:23-cv-11886 (E.D. Mich.), was publicly reported in the New York Times and other national outlets in August 2023.

52. Since Mr. Dillon's arrest, additional FRT-driven wrongful arrests have become public, further confirming that the investigative failures caused by over-reliance on FRT are systemic rather than isolated. These include the wrongful arrests of Christopher Gatlin in St. Louis (August 2021, publicly reported January 2025); Trevis Williams in New York (April 2025, publicly reported August 2025); Javier Lorenzano-Nunez in Phoenix (October 2024, publicly reported January 2026); Beau Burgess in Orlando (August 2025, publicly reported February 2026); Angela Lipps, a Tennessee resident arrested at the request of Fargo, North Dakota police (July 2025, publicly reported March 2026); and Kimberlee Williams, an Oklahoma resident arrested at the request of Maryland police (June 2021, publicly reported April 2026).

53. In June 2026, it was publicly reported that Defendant Jacksonville Sheriff's Office wrongfully arrested Charlotte, North Carolina resident Jalil Richardson after relying on an incorrect result from an FRT search in an auto theft investigation. Mr. Richardson was extradited from Charlotte to Jacksonville and held in jail for nearly three months. The state attorney dropped all charges against Mr. Richardson in May 2026.

54. In every one of these cases, the investigative pattern was materially identical to the pattern in Mr. Dillon's case: an FRT result treated as a near-definitive

13

identification, followed by a photo array or other visual identification that predictably confirmed the algorithmic error, followed by an arrest without meaningful independent corroboration. More than half of the fifteen publicly known cases of wrongful arrests following FRT searches specifically involved tainted photo arrays, as in Mr. Dillon's case. This includes JSO's arrest of Jalil Richardson.

55.    At least twenty jurisdictions, including San Francisco; Boston; Minneapolis; Jackson, Mississippi; King County, Washington; and Vermont have banned police use of FRT. Other states, including Maine, Maryland, Massachusetts, and Montana, have enacted laws restricting police use of FRT. Detroit and Indiana specifically prohibit police from making an arrest based only on an FRT result followed by a photo lineup.

56.    Despite this well-documented history of FRT-driven wrongful arrests, neither Jacksonville Beach PD nor JSO implemented safeguards sufficient to prevent exactly the type of wrongful arrest that occurred in Mr. Dillon's case.

## II.    The Incident at the Jacksonville Beach McDonald's

57.    Shortly before midnight on November 2, 2023, Jacksonville Beach PD Officer Kevin Thompson responded to a report of an individual attempting to lure or entice a minor inside a McDonald's restaurant in Jacksonville Beach.

58.    Officer Thompson spoke with the victim, a girl under the age of twelve. The victim stated that a man had repeatedly asked her if she wanted to leave the restaurant with him. She told him no. The suspect approached her a second time and asked, "Are you sure?" The victim called her mother, and the suspect left.

14

59.    The victim's parents were at the Element Hotel next door.

60.    Thompson spoke with McDonald's staff members that evening. The employees "did not observe the interaction between the suspect and the victim but stated that they could tell by the victim's demeanor that she was not comfortable."

61.    The staff could not provide surveillance footage at that time.

62.    Thompson gave the victim's father a case information card and left the restaurant.

### III.    The Surveillance Footage

63.    The next morning, November 3, 2023, Jacksonville Beach PD Officer David Cohill arrived at the McDonald's to follow up.

64.    Cohill spoke with Kaylee Clinebell, a McDonald's employee who was not present the night of the incident. Ms. Clinebell provided access to surveillance footage.

65.    As Cohill described in his reports, the footage showed "a white male wearing a black jacket with a fur-like fringe around the collar and sleeves" entering the restaurant.

66.    The footage also showed the suspect waiting for his order, noticing the victim, and checking his surroundings before approaching and speaking to her. Upon information and belief, the suspect had placed his order online or using a mobile application, because he did not place the order at the McDonald's counter. The suspect received his order and exited shortly before the victim's mother arrived.

67.    Upon information and belief, mobile orders through the McDonald's

application require an account linked to a payment method, a phone number, email or all three. These records could have been used to identify the actual person who placed the suspect's order. Upon information and belief, Jacksonville Beach PD personnel never requested or obtained mobile ordering records, payment data, or online account information from McDonald's.

68.    Cohill attached to his report two photographs he had taken with his cell phone. Upon information and belief, these photographs depicted a computer screen displaying the McDonald's surveillance footage. They were not digital or high-resolution copies of the actual surveillance video files. In the photos, the suspect image is low resolution, and the suspect's face is partially shadowed and off-axis.

**IV.    Officer O'Connell's Investigation**

69.    On or about November 9, 2023, Jacksonville Beach PD assigned Officer O'Connell as the primary investigator.

70.    About 4:00 p.m. that day, O'Connell went to the McDonald's and spoke with Brenda Wilson, the on-duty restaurant manager.

71.    Ms. Wilson stated that she was familiar with the case and had been working the night of the incident. She explained that she was "occupied with her duties and did not see or hear all the suspect's specific statements toward the [victim] but she felt a weird feeling towards his interactions with [her]."

72.    Ms. Wilson stated that she had seen the suspect in the restaurant several times before and referred to him as a "regular customer," who often appeared to be under the influence of narcotics.

16

73. Despite being told by the McDonald's restaurant manager that the suspect was a regular customer there, upon information and belief, O'Connell never reviewed older surveillance footage from the McDonald's to locate prior visits by the suspect, which could have yielded higher-quality images and additional identifying information.

74. Upon information and belief, O'Connell never sought to obtain prior surveillance footage and never asked McDonald's management to check prior transaction records, loyalty program data, or mobile ordering history that might have been associated with the suspect's regular visits.

75. At about 4:45 p.m., O'Connell attempted to contact the victim's father by telephone but he only reached his voicemail.

76. At about 5:00 p.m., O'Connell searched booking photographs and the Duval County sex offender registry. These searches did not identify a suspect.

77. On November 15, 2023, O'Connell received a call from the victim's father but obtained no new information.

78. On November 22, 2023, O'Connell returned to the McDonald's. Ms. Wilson stated the suspect had not returned since the incident, which she described as unusual given he was a regular customer.

79. The fact that the suspect had stopped visiting the restaurant, despite being a "regular," was consistent with a local individual deterred by the police response. It was wholly inconsistent with the suspect being Mr. Dillon, who lived hundreds of miles away and had never visited the restaurant—or the City—at all.

17

80. On or about November 27, 2023, O'Connell distributed an attempt-to-identify bulletin to surrounding agencies, which included images of the suspect from the McDonald's surveillance footage.

81. Upon information and belief, the images distributed by O'Connell were the low-resolution photographs of the surveillance footage screen taken by Officer Cohill earlier in the investigation. Although O'Connell had the surveillance footage, he chose not to send the footage itself, nor any high-resolution digital file he could have obtained.

82. Upon information and belief, the photos ultimately used for the FRT were the photos Officer Cohill took of the McDonald's computer screen displaying surveillance footage, not a digital extraction from the video file. These photos add another layer of degradation to the poor quality of surveillance footage, including screen glare, reduced resolution, and color distortion inherent in photographing a screen rather than exporting a digital file from the original video.

## V. The Facial Recognition Search

83. Defendant Walters received O'Connell's attempt-to-identify bulletin.

84. Upon information and belief, Walters submitted the probe images to an FRT database without assessing whether the probe images met minimum quality standards for a reliable facial recognition search, including the adequate inter-pupillary pixel count, on-axis orientation, and uniform lighting.

85. On December 15, 2023, O'Connell received an email from Walters, responding to the attempt-to-identify bulletin.

18

86.    O'Connell's investigatory notes state: "Sergeant Walters advised the provided photos were submitted through a facial recognition program. The photos revealed a 93% match on facial features to Robert Dwayne Dillon."

87.    Walters' characterization of the FRT result as "a 93% match on facial features" was a highly misleading statement.

88.    Upon information and belief, Walters' email did not include any caveat that the result was an investigative lead only, was not a positive identification, and could not constitute probable cause—despite JSO's own policies and Sheriff Waters' own public statements acknowledging these limitations.

89.    Upon information and belief, Walters did not disclose to O'Connell the number of candidates returned by the FRT search, the similarity scores of other candidates, or any information bearing on the reliability or limitations of the result.

90.    Upon information and belief, the probe images Walters used were the photographs taken of a computer screen displaying surveillance footage, or images of comparable quality, not high-resolution digital exports of the surveillance video.

91.    Upon information and belief, Walters did not conduct or obtain peer review of the FRT results before transmitting them to O'Connell.

92.    Upon information and belief, the probe image used in Mr. Dillon's case fell below the minimum image quality standards required for reliable facial recognition matching, including with respect to inter-pupillary (inter-eye) distance, lighting, and resolution.

93.    Upon information and belief, in the probe image, the suspect's face was

partially in shadow, turned off-axis, and poorly lit. The lighting was non-uniform and facial features were obscured. Upon information and belief, the image violated t recognized standards for a quality facial recognition probe image.

94. Upon information and belief, Walters did not inform O'Connell that the quality of the submitted probe images was poor and that the low quality of the images reduced the reliability of the search results.

95. There is no indication that O'Connell asked Walters or anyone at JSO for any information regarding the FRT search, including: the number of possible matches returned; the similarity scores of other candidates; the specific algorithm used; any assessment of probe image quality; or the candidate list from which Mr. Dillon was selected.

96. Walters knew JSO's own policies recognizing that FRT results are not positive identifications; and he knew or should have known that characterizing an unreliable result as a "93% match" without qualification created a foreseeable risk that the requesting agency would treat the result as a near-definitive identification.

97. No Jacksonville Beach PD supervisor reviewed the facial recognition result for reliability or questioned its characterization as a "93% match" before it was incorporated into O'Connell's investigation.

98. After receiving Walters' FRT search results, O'Connell conducted a local records search and found no Jacksonville Beach PD contacts for Mr. Dillon.

**VI.    The Phone Call to Mr. Dillon**

99. On the afternoon of December 15, 2023, O'Connell called Mr. Dillon,

20

identifying himself as an officer with the Jacksonville Beach PD.

100.    O'Connell stated he was investigating an attempted child abduction.

101.    Mr. Dillon was surprised and immediately questioned what the matter had to do with him.

102.    Mr. Dillon recalls O'Connell stating: "I'm looking at your mugshot right now, and I'm looking at surveillance video footage, and I'm convinced it was you."

103.    Mr. Dillon denied any involvement and stated the person in the video could not be him.

104.    Mr. Dillon told O'Connell he lives in Fort Myers and he had never been to Jacksonville Beach in his life, aside from passing the exit on the highway.

105.    O'Connell stated he did not believe Mr. Dillon.

106.    Mr. Dillon told O'Connell: "You've got the wrong guy. I have very distinctive scars. I've had skin cancer and have a scar running from my hairline down to my nose."

107.    O'Connell responded, again: "I'm convinced it's you."

108.    Mr. Dillon again denied involvement. O'Connell asked if Fort Myers police could come to his home, and Mr. Dillon stated: "Of course I will" cooperate.

109.    Following the call, Mr. Dillon contacted his local law enforcement agency, the Fort Myers Police Department. An employee told him the call sounded like a hoax, and that law enforcement would not telephone a suspect wanted for child abduction, but would simply arrest him.

110.    Mr. Dillon called the Jacksonville Beach PD. The individual who

21

answered stated that no one on duty was aware of any attempted child abduction investigation matching that description and that the call sounded like a scam.

111. Mr. Dillon received no further communication about the investigation until a Lee County sheriff's deputy showed up at Mr. Dillon's home to arrest him eight months later, in August 2024.

112. O'Connell's phone call during which Mr. Dillon denied any involvement, stated he had never been to Jacksonville Beach, described his distinctive physical features inconsistent with the suspect, and expressed a willingness to cooperate, was never documented in O'Connell's investigation file and was not disclosed to the magistrate in the warrant application.

113. O'Connell's conduct was not an aberration or an unforeseeable act of individual recklessness. It was the predictable consequence of Jacksonville Beach PD's failure to provide its officers with the training, guidance, and supervision necessary to use FRT in a constitutionally compliant manner.

### VII.   The Photo Lineup

114. Based entirely on the results of the FRT search, on January 3, 2024, O'Connell requested a photo array from the General Investigations Unit including Mr. Dillon as the person of interest.

115. On January 9, 2024, at about 1:00 p.m., O'Connell called the victim's father to discuss a photo lineup. The call went to voicemail.

116. On January 10, 2024, Jacksonville Beach PD Officer Dustin Gibson administered the photo array to Ms. Wilson at the Jacksonville Beach McDonald's.

117.   Gibson presented photographs to Ms. Wilson one at a time, then provided all six photographs for simultaneous review.

118.   O'Connell later falsely described this procedure in the warrant application as "sequential." It was not sequential. The simultaneous presentation of all six photographs allowed Ms. Wilson to make relative judgments, comparing photographs to each other rather than to her independent memory, increasing the risk of misidentification.

119.   Ms. Wilson identified photograph number two—Robert Dillon—as the suspect "[who was] wearing a black trench coat on the night of the incident."

120.   Ms. Wilson's sworn handwritten statement reads: "On the 10th day of Jan, 2024 officer showed 6 photos I am 100% percent sure that #2 was the man that was here that night wearing a Black Trench Coat. The father can [sic] in and ask me if I have seen the man in the Trench Coat. I told him yes. He let me know that this man had [unintelligible; possibly 'lured'] his child in bathroom and he was calling the cops."

121.   Ms. Wilson was not an eyewitness to the suspect's interaction with the victim. She stated that she was "occupied with her duties" on the night of the incident and "did not see or hear all the suspect's specific statements." Her identification rested on her claimed familiarity with the suspect as a "regular customer." Moreover, her recollection of the suspect was not fresh; more than two months had elapsed since the incident.

122.   No one at the Jacksonville Beach PD ever presented any photographs to the victim.

23

123.   A fundamental defect in the photo array is that it could not provide independent corroboration of the FRT result, because it was built around that result. The FRT system had already selected Mr. Dillon. When his photograph was then surrounded by five fillers — chosen to resemble Mr. Dillon, not the suspect — Mr. Dillon became, almost by definition, the person in the array who most closely resembled the suspect Ms. Wilson recalled. Her selection of Mr. Dillon did not confirm the FRT match; it merely repeated it, lending the same algorithmic error the false appearance of independent confirmation.

124.   No Jacksonville Beach PD supervisor reviewed the photo array procedure, including the fact that the lineup was administered to a witness who did not observe the crime, that the photo display included a simultaneous component despite being characterized solely as sequential, and that the array was seeded with a photograph identified through FRT.

**VIII.    The License Plate Search and Results**

125.   On January 9, 2024, at about 2:00 p.m., O'Connell requested license plate reader data for two vehicles registered to Mr. Dillon, for November 1 through November 3, 2023—the day before, the day of, and the day after the McDonald's incident.

126.   On January 12, 2024, JSO Crime Analyst Sarah Hinman queried those two license plates for that period.

127.   Neither vehicle was captured by license plate readers (LPRs) anywhere in Duval County during that three-day period.

128. O'Connell did not include in the warrant application the fact that he requested this search and received the negative results.

### IX.   The Investigation Goes Dormant

129. As of January 19, 2024, O'Connell had not obtained a photo lineup identification from the victim. He made only one additional attempt to contact the victim's father by telephone, reaching voicemail.

130. There were no further entries in the case record from January 19, 2024 until July 31, 2024.

131. Upon information and belief, during this six-month period, O'Connell conducted no further investigation.

132. Aside from the one phone call that went to voicemail, he did not attempt to contact the victim, either directly or through her parents.

133. He did not display the photo array to, nor obtain any other identification of the suspect, from the victim.

134. He did not contact Mr. Dillon again, despite Mr. Dillon's earlier denials and expressed willingness to cooperate.

135. He did not investigate Mr. Dillon's physical characteristics, including the prominent scar from his hairline to his nose, against the surveillance footage.

136. He did not investigate whether Mr. Dillon had any connection to Jacksonville Beach, any travel history to the area, or any other evidence corroborating his innocence.

137. He did not follow up on the negative LPR results.

138.    He did not reconcile the contradiction between the suspect's "regular customer" status and Mr. Dillon's residence more than 300 miles away.

139.    He did not request mobile ordering records, payment data, or loyalty account information from McDonald's.

140.    He did not review older surveillance footage from the McDonald's to locate prior visits by the "regular customer" suspect, which could have yielded higher-quality images.

141.    He did not request or review cell phone location data, financial records, or any other records that might have placed Mr. Dillon in or excluded him from Jacksonville Beach on November 2, 2023.

##    X.    The Warrant Application

142.    On July 31, 2024, more than six months after active investigation ceased, O'Connell submitted a warrant request for Mr. Dillon to the State Attorney's Office for luring/enticing a juvenile under twelve.

143.    On August 1, 2024, Judge London M. Kite signed the arrest warrant.

144.    The warrant narrative stated in pertinent part that "Sergeant Walters advised the provided photos were submitted through a facial recognition program. The photos revealed a 93% match on facial features to Robert Dwayne Dillon []."

145.    The warrant narrative described Ms. Wilson as having "provided a similar suspect description as the victim," without disclosing that she did not witness the suspect's interaction with the victim and was occupied with her duties during the incident.  The narrative did not set out the victim's purported description, if one was

26

ever obtained.

146. The warrant narrative described the photo lineup as "sequential" when it in fact the photos were also arrayed simultaneously.

147. The warrant narrative stated that Ms. Wilson selected Mr. Dillon's photograph and that he was "the same subject identified by Sergeant Walters using facial recognition technology," language reinforcing the misleading impression that two independent forms of evidence corroborated Mr. Dillon's identity when, in fact, the array identification was a predictable byproduct of the FRT error.

148. Walters's characterization of the FRT result as "a 93% match on facial features," adopted in O'Connell's warrant affidavit, drove every subsequent step of the investigation and served as a central basis for the magistrate's probable cause finding. Without that characterization, the chain of events leading to Mr. Dillon's wrongful arrest would not have occurred.

## XI.   What O'Connell Knew and Omitted

149. At the time he swore out the warrant affidavit, O'Connell possessed, had obtained, or had access to the following exculpatory and material information, none of which was disclosed to the magistrate:

   a. **Negative LPR results.** O'Connell requested a search of automated license plate readers for Mr. Dillon's two vehicles for the period November 1 through November 3, 2023. The search confirmed that neither vehicle was detected anywhere in Duval County during that period. He omitted this from the warrant.

   b. **The "regular customer" contradiction.** Ms. Wilson described the suspect as a "regular" she had seen "several times before." O'Connell knew Mr. Dillon lived in Fort Myers, more than 300 miles away. He

27

included neither the "regular" customer description nor Mr. Dillon's location over 300 miles away in the warrant.

c. **Mr. Dillon's denial and physical description.** O'Connell called Mr. Dillon, who denied any involvement, stated he had never been to Jacksonville Beach, and described a distinctive scar from his hairline to his nose. O'Connell omitted this call and Mr. Dillon's exculpatory statements entirely.

d. **The low quality of the probe image.** O'Connell had access to the surveillance images and was the officer who created and distributed the attempt-to-identify bulletin. Upon information and belief, he knew the images were photos of a computer screen, low-resolution, poorly lit, and depicted the suspect off-axis with shadows obscuring facial features. He did not disclose the poor quality of the probe image or its impact on the reliability of the FRT result.

e. **FRT limitations.** Jacksonville Beach PD's own General Order states that FRT results are "strictly investigative leads." O'Connell did not disclose to the magistrate that FRT results cannot constitute a positive identification, are inherently unreliable, and do not constitute probable cause under Jacksonville Beach PD's own policy.

f. **The non-sequential nature of the lineup.** The warrant described the lineup as "sequential" when Jacksonville Beach PD Officer Gibson also presented all six photographs simultaneously for side-by-side comparison.

g. **Ms. Wilson's limited observation.** The warrant described Ms. Wilson as providing "a similar suspect description as the victim," creating the impression she witnessed the crime. In fact, she did not because she was occupied with her work duties.  If a description was ever obtained from the victim, it was not included in the warrant application.

150. These omissions and misstatements reflect a pattern of conduct consistent with knowing omission or reckless disregard for the truth.

151. O'Connell actively obtained the exculpatory evidence; he requested the LPR search; he interviewed Ms. Wilson; and he spoke with Mr. Dillon. O'Connell then excluded this information from the warrant application.

152. Before seeking the warrant, O'Connell had all the exculpatory evidence for over six months, during which time he conducted no further investigation and took no steps to resolve the contradictions in his case.

153. O'Connell made a deliberate choice to disregard Mr. Dillon's exculpatory statement rather than verify it through any of the readily available investigative tools at his disposal.

154. O'Connell did not merely fail to investigate. He instead affirmatively chose not to pursue readily available investigative avenues that would have confirmed or excluded Mr. Dillon, including: mobile ordering records, payment data, McDonald's account records from the night of the incident, older surveillance footage showing the "regular customer's" prior visits, a comparison of Mr. Dillon's physical features (including his scar) to the surveillance footage, cell phone location records, time-stamped photographs and travel or financial records.

155. If the omitted exculpatory evidence was included in the warrant application and if the misstatements were corrected, no arrest warrant would have been issued.

156. No Jacksonville Beach PD supervisor assessed whether the totality of the evidence, including the weakness of the FRT lead, the tainted photo array identification, the negative LPR results, the "regular customer" contradiction, and Mr. Dillon's exculpatory statements, was sufficient to establish probable cause before O'Connell submitted the warrant application.

157. No Jacksonville Beach PD supervisor reviewed the warrant application

for accuracy, completeness, or compliance with the FRT policy before it was submitted to the State Attorney's Office.

158.    Upon information and belief, Jacksonville Beach PD had no procedure requiring supervisory review of warrant applications in cases involving FRT leads, despite the well-documented risk that officers would treat FRT results as conclusive identifications and omit material exculpatory information from warrant applications.

## XII.    The Arrest

159.    During the evening of August 26, 2024, Lee County Sheriff's Deputy Carlos Linares arrived at Mr. Dillon's home in Fort Myers to execute the arrest warrant.

160.    The arrest was recorded on Deputy Linares's body camera.

161.    Mr. Dillon, visibly upset, stated: "Are you shitting me, man?"

162.    Mr. Dillon's wife, who was also present, asked: "What is going on?"

163.    Before Mr. Dillon was handcuffed, his wife told Deputy Linares: "He's never even been up there."

164.    Mr. Dillon stated: "I haven't been out of Fort Myers in two years."

165.    Mr. Dillon repeatedly maintained his innocence.

166.    Deputy Linares responded: "I don't know what to tell you[]. This isn't our investigation, it's all Jacksonville."

167.    Mr. Dillon, who was wearing a sleeveless t-shirt, shorts and sandals, was transported first to a Lee County Sheriff's Office satellite facility in Coconut Point, where he was placed in a holding cell and held for several hours. The cell was kept at

a near-freezing temperature and contained only a bare steel bunk with no mattress. Mr. Dillon's requests for a blanket and warmer clothing went unanswered. He was never offered food, water, or a phone call. He was left, alone, shaking, with his teeth chattering from the cold.

168.   Late that evening, Mr. Dillon was placed in the back of a transport van with his hands cuffed behind his back and his legs shackled. The interior of the van was modified to enclose detainees in a steel cage, was unlit, and left Mr. Dillon in the pitch black, unable to see anything during the ride. He was not secured by a seatbelt. The van was driven for several hours, during which Mr. Dillon was thrown against the steel cage with each turn and stop, while the rear handcuffs cut off circulation to his arms.

169.   The van eventually arrived at a Lee County detainee processing center in downtown Fort Myers. Mr. Dillon was placed in a group holding cell with other detainees, where he sat in silence, too frightened by the gravity of the charge to speak with or interact with anyone. During the booking process, Mr. Dillon was required to provide a DNA sample against his will.

170.   Throughout the arrest, transport, and booking process, Mr. Dillon was tormented by the prospect of explaining to his wife and to his young daughter, who was around the same age as the child Mr. Dillon was falsely accused of attempting to lure, that he had been arrested for luring or enticing a child. The charge carries among the most devastating social stigmas of any criminal offense, and Mr. Dillon, who loves children, believed he might never see his wife or daughter again. He did not trust that

31

the criminal justice system would give him a fair opportunity to prove his innocence, and he believed that his life as he had known it was over. Notwithstanding his complete innocence, he feared the consequences of a conviction, including incarceration and the permanent destruction of his reputation and livelihood.

171. Mr. Dillon posted bond the following day by borrowing funds and pledging the title to his truck as collateral. The bond cost $1,500 in cash plus the temporary loss of his vehicle title.

### XIII.   Post-Arrest Proceedings and Dismissal

172. Mr. Dillon retained a criminal defense attorney at a cost of several thousand dollars.

173. On October 7, 2024, Mr. Dillon pleaded not guilty to all charges.

174. On October 24, 2024—69 days after his wrongful arrest—the State Attorney's Office finally dropped all charges.

175. No law enforcement agency ever apologized or acknowledged the error.

176. Jacksonville Beach PD stated: "We will not be commenting on this matter beyond stating that all warrant requests are submitted to the State Attorney's Office. It is solely their decision whether or not to move forward with issuing a warrant."

177. Jacksonville Sheriff Waters stated: "If you came to me with a facial recognition hit and that was your probable cause, I would probably kick you out of my office because that's not how it works."

178. After Mr. Dillon filed this lawsuit, the Pinellas County Sheriff's Office

stated: "Facial recognition results are never 'matches'"; "Independent investigation is required to determine whether any person in a photo array return in the facial recognition system is the person who committed a crime"; Following a FRT search, "a law enforcement officer [must] determine probable cause through independent means"; and "It was wrong for the [Jacksonville Beach ]PD officer to determine probable cause existed to arrest someone solely based on their photo appearing in a facial recognition photo array."

179.    After the charges against Mr. Dillon were dropped on October 24, 2024, Jacksonville Beach PD did not investigate the circumstances of the wrongful arrest.

180.    Jacksonville Beach PD did not retrain its officers on the limitations of FRT or the proper procedures for investigating cases involving FRT leads.

181.    Jacksonville Beach PD did not revise its General Order to include the operational safeguards, corroboration requirements, supervisory review protocols, or disclosure obligations that were obviously necessary to prevent future wrongful arrests.

### XIV.    Injuries and Ongoing Harm

182.    It took nearly a full year for Mr. Dillon's arrest to be expunged from his record.

183.    Even after dismissal of charges, Mr. Dillon's mugshot remained publicly accessible on government and third-party websites, visible to anyone who searched his name. None of the law enforcement agencies responsible for the wrongful arrest took action to remove it. The mugshot was eventually removed from the Lee County website only after a television reporter intervened on Mr. Dillon's behalf. Even then,

the mugshot and arrest record remained on third-party websites.

184. The mugshot's persistence online meant that, even though Mr. Dillon was legally free of all charges, anyone encountering the image could have believed he was the perpetrator of an attempted child luring.

185. At the time of his arrest, Mr. Dillon was self-employed as a commercial crabber. In a normal week, Mr. Dillon would harvest crabs off Florida's west coast six days a week. The arrest and its aftermath occurred during the most lucrative period of the stone crab season, when Mr. Dillon would typically harvest several thousand pounds of crabs per week.

186. For about a month after the arrest, Mr. Dillon could not work. He was unable to concentrate on anything other than the pending charges and the continued public availability of his mugshot. He did not want to be in public for fear of being confronted as a suspected child abductor.

187. The lost income during this period was substantial and contributed to lost business opportunities. Mr. Dillon fell behind on his monthly rent and was forced to ask his landlord for additional time to bring his account current. When he was faced with the prospect of losing his home, Mr. Dillon was compelled to return to work despite his continuing emotional distress.

188. Mr. Dillon's interactions with the public, and with children in particular, have been permanently altered. Before his arrest, Mr. Dillon would freely make small talk and joke with children he encountered in stores, restaurants, and other public places. Since his arrest, Mr. Dillon avoids interacting with children in public because

he fears that any friendly interaction could be misinterpreted and lead to another false accusation.

189. Community members still approach him in public and ask him about his arrest and the accusations levied against him by the Jacksonville Beach PD.

190. Upon information and belief, Mr. Dillon's photographs remain in the databases that feed the FRT system that falsely identified him. Upon information and belief, he cannot opt out or remove his image. Every time an FRT search is run using that system, Mr. Dillon's image is searched. Indeed, in an investigation of an April 2023 altercation at a bar, a Lee County sheriff's deputy identified Mr. Dillon as a suspect through an FRT search, demonstrating that his image is subject to repeated search. As long as those photographs remain in the system, Mr. Dillon faces an ongoing risk that the same AI technology that already wrongfully identified him once will do so again in a future search.

## XV. Officer O'Connell's Background

191. Officer O'Connell's history was known and documented when Jacksonville Beach PD entrusted him with the McDonald's investigation, and when it promoted him afterwards.

192. Before joining Jacksonville Beach PD, O'Connell was a deputy with the St. Johns County Sheriff's Office.

193. In 2010, O'Connell's sister died under suspicious circumstances while in the home of another St. Johns County sheriff's deputy. The death, caused by that deputy's firearm, was initially deemed a suicide. But a special prosecutor was

appointed after different medical examiners disagreed as to the cause of death (suicide vs. homicide) and the sheriff acknowledged his office made missteps in handling the investigation.

194. In or around March 2012, after a special prosecutor announced that the death would remain classified as a suicide, O'Connell had an extreme emotional outburst in which he threatened to "blow up" the sheriff's office.

195. O'Connell was thereafter terminated from the St. Johns County Sheriff's Office.

196. In or around April 2013, the sheriff reinstated O'Connell.

197. In July 2017, O'Connell was arrested for domestic battery. According to the arrest report, O'Connell punched his wife in the face during an argument in their bedroom. O'Connell's wife told law enforcement that O'Connell had been mentally abusive toward her since 2011.

198. O'Connell was charged with a first-degree misdemeanor battery.

199. O'Connell resigned from the St. Johns County Sheriff's Office, stating in his resignation letter: "Due to recent events, I have come to terms with the fact my service will not be as effective as required by the position of Deputy Sheriff."

200. At some point thereafter, notwithstanding his prior history, Jacksonville Beach PD hired O'Connell as an officer.

201. Jacksonville Beach PD assigned O'Connell as the primary investigator on the McDonald's case—a sensitive investigation involving an attempt to lure a child.

202. On December 3, 2024, just one month after the charges against Mr.

Dillon were dropped and while his arrest record had not yet been expunged, Jacksonville Beach PD promoted O'Connell to the rank of corporal.

### XVI.    Jacksonville Beach's Notice and Deliberate Indifference

203.    By adopting a written policy governing its officers' use of FRT, Jacksonville Beach PD acknowledged that facial recognition technology posed sufficient risks to warrant institutional regulation. Having undertaken to regulate the technology, Jacksonville Beach PD assumed the obligation to do so in a manner that addressed the technology's known and inherent risks.

204.    Jacksonville Beach PD's General Order was facially deficient because it failed to address—or even acknowledge—the most fundamental and well-understood risk of facial recognition technology: that FRT is designed to return the faces in a database that look most similar to a probe image, meaning that a false match will, by algorithmic design, be a lookalike or doppelganger of the actual suspect.

205.    This doppelganger problem is not an obscure or recently discovered limitation. It is inherent in the way every facial recognition system operates: the system searches for similarity, not identity. Any policymaker who understood the basic mechanics of the technology Jacksonville Beach PD purported to regulate would have understood that an FRT search result will often return an innocent person who resembles the actual suspect, and that placing that lookalike's photograph in a photo lineup would predictably lead a witness to select that innocent person.

206.    Despite this inherent and foreseeable risk, the General Order contained no guidance addressing the interaction between FRT results and photo lineup

37

procedures. It did not warn officers that a photo lineup constructed around an FRT-identified candidate carries a heightened risk of false identification. It did not require any additional safeguards before a lineup is seeded with an FRT candidate. It did not even acknowledge that this risk exists.

207. The General Order's directive that officers base law enforcement action on "the agency's own identity determination and not solely the results of the FACESNXT results" is misleading. This language created the appearance of a safeguard by instructing officers to make their own determination, but it provided no framework for how that determination should be made. Thus, the Jacksonville Beach PD policy includes no standards for what constitutes adequate corroboration, no guidance on what types of evidence are independent of the FRT result, and no criteria for when an FRT lead has been sufficiently verified or refuted. An officer reading this policy could reasonably conclude that conducting a photo lineup based on the FRT lead constitutes the "agency's own identity determination," which is exactly what O'Connell did. The policy invited precisely the conduct it was supposed to prevent. The policy also provides no guidance on how to handle results from FRT systems other than FACESNXT.

208. The General Order also failed to address probe image quality despite the fact that probe image quality is the single most significant factor affecting the reliability of any FRT search.

209. Generally accepted facial recognition training protocols establish minimum standards for image quality, on-axis orientation, and uniform lighting.

Jacksonville Beach PD's General Order contained no requirement that officers assess, document, or even consider the quality of the images being submitted for FRT analysis. It did not instruct officers that low-quality probe images produce unreliable results. It did not require officers to communicate image quality concerns to partner agency JSO before or after a search was conducted.

210. The General Order did not require officers to request information about the number of candidates returned by a search, the similarity scores of other candidates, or any other information that would allow the requesting officer to assess the reliability of the result. The policy thus ensured that officers would receive a single name, possibly accompanied by a similarity score, with no context for evaluating what that number meant or how much weight to give it.

211. These deficiencies are not matters of hindsight. Every one of them flows directly from the basic mechanics of how facial recognition technology works, which Jacksonville Beach PD necessarily understood when it adopted a policy governing the technology. Jacksonville Beach PD's FRT policy and practice ignore the technology's most foreseeable failure modes by failing to address probe image quality, the doppelganger problem, the interaction between FRT and photo lineups, or the need for independent corroboration. Such a policy and practice lead to the violation of constitutional rights, as it did here for Mr. Dillon.

212. The risks that materialized in Mr. Dillon's case are inherent in the technology and would be apparent to any policymaker who understood the basics of how facial recognition technology works.

213. When a law enforcement agency authorizes its officers to use a technology that is (1) known to produce false positives, (2) produces false positives in the form of lookalikes, and (3) generates seemingly precise numerical scores that convey unwarranted certainty, but provides its officers with (a) no training on the technology's limitations, (b) no guidance on corroboration, and (c) no supervisory oversight—the risk that an officer will treat the technology's output as a near-definitive identification and use it to support a constitutionally deficient warrant is not only foreseeable – it is virtually certain.

214. This is not a case where the constitutional violation resulted from a novel or unforeseeable failure. It is a case where the constitutional violation resulted from the most basic and predictable failure mode of the technology: a false match feeding into a tainted lineup. Jacksonville Beach PD's policy did nothing to guard against it.

215. Upon information and belief, Jacksonville Beach PD did not provide adequate training to its officers, including O'Connell, on any of the following subjects:

    a. The limitations and known error rates of facial recognition technology;

    b. The critical importance of probe image quality to the reliability of FRT results;

    c. The phenomenon of doppelganger matches (when FRT produces a false match, the returned candidate will, by algorithmic design, look similar to the actual suspect) and the implications of this phenomenon for the reliability of subsequent photo lineup identifications;

    d. The tendency to substitute an algorithm's output for independent professional judgment and the specific risk that a seemingly precise metric like "93% match" would lead officers to overweight the FRT result;

40

e. The requirement that FRT results be independently corroborated through evidence unrelated to the FRT lead before being used to support a warrant application;

f. Proper photo lineup procedures when the person of interest was identified through FRT, including the heightened suggestiveness of a lineup created with an FRT-identified doppelganger;

g. The obligation to disclose to prosecutors and magistrates the use of FRT, its limitations, the quality of the probe image, and any other information bearing on the reliability of the FRT lead when seeking a warrant;

h. The obligation to include material exculpatory information in warrant applications, including evidence that contradicts an FRT lead;

i. The specific and well-documented risks of FRT-driven misidentifications.

216.    The need for training on these subjects was obvious. Jacksonville Beach PD authorized its officers to request FRT searches through JSO, receive FRT results, and use those results to drive investigations, construct photo lineups, and support warrant applications. Yet it provided no training on the technology's limitations, its known failure modes, or the specific safeguards necessary to prevent the foreseeable constitutional violations that had already occurred repeatedly in other jurisdictions using the same investigative pattern.

217.    Jacksonville Beach PD's General Order explicitly demonstrates that the department understood FRT results are not positive identifications. But understanding that FRT is unreliable while failing to provide any operational guidance for officers who receive unreliable results is not a legitimate, constitutionally acceptable policy. It is instead an acknowledgment of a known danger coupled with a deliberate decision to leave officers without the tools to avoid it.

218. The Pinellas County Sheriff's Office promulgates to partner agencies probe image quality standards and identifies factors that degrade FRT accuracy. Upon information and belief, Jacksonville Beach PD had access to these materials as a condition of its participation in and access to the FACES database. These materials reinforced what the technology's basic mechanics already made clear: that FRT results are highly dependent on input quality, that low-quality probe images produce unreliable results, and that results must be treated with caution. Jacksonville Beach PD's General Order addressed none of this.

219. By hiring O'Connell—an officer who had been terminated for threatening to "blow up" his previous agency and who thereafter resigned from the same agency before disciplinary proceedings could lead to a second termination following domestic battery charges—Jacksonville Beach PD assumed a heightened obligation to supervise his investigative conduct.

220. By the time O'Connell sought Mr. Dillon's warrant in July 2024, the nationwide pattern of FRT-driven wrongful arrests, as described in paragraphs 44–56, had placed Jacksonville Beach PD on actual or constructive notice that its written FRT policy was inadequate. It was or should have been clear to Jacksonville Beach PD that officers needed additional training on the proper use of FRT technology to prevent misuse of FRT results, including explicit instructions that such technology is an insufficient basis for arresting a suspect, and that FRT results can taint photo lineups, resulting in false identifications.

221. Upon information and belief, O'Connell's warrant application was not

reviewed by any supervisor for reliability, sufficiency, or compliance with Jacksonville Beach PD's own FRT policy before submission to the State Attorney's Office.

222. Rather than investigating the wrongful arrest, retraining officers, or reevaluating its FRT policies, Jacksonville Beach PD promoted O'Connell to corporal.

223. The promotion sent an institutional signal that O'Connell's decisions to treat an unreliable FRT result as a near-definitive identification, omit exculpatory evidence from a warrant application, and fail to conduct basic corroborative investigation, were at least acceptable, if not laudable.

## XVII. Jacksonville Sheriff's Office's Role in the Facial Recognition Process and Its Failure to Adopt Adequate Safeguards

224. JSO uses facial recognition technology to conduct facial recognition searches both for its own investigations and at the request of partner agencies, including Jacksonville Beach PD.

225. Upon information and belief, JSO conducts searches for partner agencies, including Jacksonville Beach PD, on a routine and recurring basis.

226. JSO's role in the facial recognition process is not ministerial. JSO personnel receive probe images from partner agencies, submit those images to FRT systems, review the candidate results returned by the algorithm, and decide what information to transmit to the requesting agency. This necessarily includes responsibility for characterizing the results, determining whether to include caveats about reliability, and determining whether to disclose the quality of the probe image, the number of candidates returned, or the similarity scores of other candidates.

227. These types of decisions—what to search, how to evaluate results, what to communicate, and what to withhold—require exercises of judgment by JSO personnel that directly shape the course of the partner agencies' criminal investigations.

228. Upon information and belief, at all times relevant to this Complaint, JSO had no written policy governing the dissemination of facial recognition results to partner agencies that included any of the following safeguards:

a. Minimum probe image quality standards that must be met before a search is conducted;

b. Supervisory approval of search results before dissemination to a requesting agency;

c. Mandatory disclosure to the requesting agency of the number of candidates returned, the similarity scores of all candidates, and a quality assessment of the probe image;

d. Mandatory warnings accompanying every disseminated result stating that the result is an investigative lead only, is not a positive identification, and cannot constitute probable cause for an arrest;

e. Prohibitions on characterizing results using language such as "match" or "93% match" that conveys unwarranted certainty;

f. Requirements that JSO personnel assess whether a probe image is of sufficient quality to produce a reliable result before processing the search;

g. Follow-up protocols to determine whether requesting agencies are using FRT results in constitutionally compliant ways;

h. Auditing of facial recognition searches and their downstream outcomes to identify patterns of misuse or false positives; or

i. Documentation requirements for the search process, including which images were submitted, which algorithm was used, how many candidates were returned, and what information was communicated to the requesting agency.

229. The absence of these safeguards means that, at all times relevant to the complaint, JSO personnel had unfettered discretion to characterize FRT results in whatever terms they chose, to include or omit whatever contextual information they wished, and to transmit results to partner agencies without any quality control or institutional oversight.

230. Upon information and belief, JSO did not provide adequate training to its personnel, including Sergeant Walters, on the limitations and known error rates of facial recognition technology; the critical importance of probe image quality to the reliability of results; the proper characterization of FRT results when communicating them to partner agencies; the dangers of using language that conveys unwarranted certainty to requesting officers; the requirement that FRT results be treated as investigative leads only and never as positive identifications; or the foreseeable risk that partner agencies would treat FRT results as a primary basis for arrest warrants.

231. The need for such training was obvious. FRT's unreliability was documented, the nationwide pattern of wrongful arrests was growing, and JSO played a central role as the intermediary between the FRT system and partner agencies that rely on JSO's characterization of results to guide their investigations. These circumstances made it patently foreseeable that JSO's failure to train its personnel on these subjects would result in JSO disseminating unreliable, misleadingly characterized FRT results that partner agencies would use to support constitutionally deficient arrest warrants.

232. The risks that materialized in Mr. Dillon's case are inherent in the basic

45

mechanics of facial recognition technology. Facial recognition technology is designed to find the most similar-looking faces in a database. It does not determine identity.

233. JSO does not merely access FRT as an end user. It serves as the intermediary between the FRT systems and partner agencies. JSO personnel receive probe images, submit them to the system, review the results, and decide how to characterize and transmit those results to requesting agencies. JSO's central role in this process means it necessarily understood how the technology works, what it produces, and what it does not.

234. JSO knew that FRT results are similarity scores, not identity determinations. JSO knew that low-quality probe images degrade the reliability of results. JSO knew that a false match will, by algorithmic design, return a candidate who closely resembles the actual suspect. JSO knew that a requesting agency receiving a result characterized as a "93% match," without caveats or context, would be at significant risk of treating that result as a near-definitive identification.

235. JSO's own direct experience confirmed these risks. In 2015, JSO detectives ran a poor-quality photograph through the FACES system, resulting in the identification and arrest of Willie Allen Lynch for buying crack cocaine. The algorithm expressed low confidence in the match, yet a JSO analyst sent Lynch's photo and criminal history to investigating officers, asserting he was the likely perpetrator. During the criminal trial, the facial recognition analyst testified that she did not understand how the face recognition algorithm worked. During the appeals process, detectives conceded they were not provided with the photos of any other people that

FACES produced as possible matches.

236.    The *Lynch* case put JSO on direct notice that its own personnel were transmitting FRT results without adequate quality assessment, without meaningful caveats, and in a manner that led officers to treat algorithmic output as near-definitive identification.

237.    JSO's top policymaker, Sheriff Waters, publicly acknowledged FRT's limitations. He stated: "If you came to me with a facial recognition hit and that was your probable cause, I would probably kick you out of my office because that's not how it works."

238.    The experience of law enforcement agencies in other jurisdictions further confirmed the risk. Between 2019 and July 2024, at least six publicly reported wrongful arrests across the country were attributed to police reliance on erroneous FRT results, as set forth in paragraphs 44–56 of this Complaint. In each case, the investigative pattern was materially identical to the pattern in Mr. Dillon's case.

239.    JSO's policies and practices governing the dissemination of FRT results to partner agencies remained unchanged throughout this period.

240.    Sheriff Waters' public statements demonstrate that JSO leadership understood that FRT results are unreliable, cannot constitute probable cause, and require substantial corroboration. Yet JSO's institutional practices remained unchanged: FRT results continued to be transmitted to partner agencies without mandatory caveats, without quality assessment of probe images, without supervisory review, and without any safeguards addressing the foreseeable risk that requesting

47

agencies would treat those results as probable cause for an arrest.

241.    In Mr. Dillon's case, Walters transmitted the FRT result to O'Connell characterized as "a 93% match on facial features"—language that conveyed unwarranted certainty—without any caveat that the result was an investigative lead only, without disclosing the poor quality of the probe image, without disclosing the number of other candidates returned or their scores, and without any warning that the result could not constitute probable cause. O'Connell incorporated this language directly into the warrant affidavit, where it served as a central basis for the magistrate's probable cause finding.

242.    No JSO supervisor flagged Walters' communication to O'Connell as deficient, and JSO took no corrective action regarding Walters' handling of the search even after the charges against Mr. Dillon were dropped. Walters' transmission of an unreliable facial recognition result to a partner agency, without caveats, without disclosure of probe image quality, and without disclosure of the other candidates returned, was the predictable consequence of JSO's failure to adopt any policy, training, or supervisory framework governing the dissemination of FRT results to partner agencies.

243.    Walters' conduct was not an aberration but the foreseeable outcome of an institutional vacuum. An agency that authorizes its personnel to run facial recognition searches on behalf of partner agencies, but provides no policy governing how results should be characterized, no requirement of supervisory review, no standardized caveats, and no training on the limitations of the technology, creates a

48

foreseeable risk that those personnel will transmit results in exactly the manner Walters transmitted them in this case.

244. JSO's failure to address these problems led to the recent wrongful arrest of Jalil Richardson on auto theft charges. Mr. Richardson, who was at work 400 miles from Jacksonville in Charlotte, North Carolina at the time of the incident, was wrongfully arrested in March 2026 after JSO personnel ran the suspect's image through a facial recognition search, received Mr. Richardson's photo back as one of the possible candidate matches, characterized that result as an "85% match," and took only one additional investigative step: administering a tainted photo lineup to the victim. Mr. Richardson spent nearly three months in jail before charges were dropped, leading to loss of his job, his home, and custody of two of his children.

## XVIII. Defendants Have Long Been on Notice of FRT's Limitations

245. The Pinellas County Sheriff's Office's training materials, made available to partner agencies with access to the FACES system, including JSO and Jacksonville Beach PD, acknowledge that the reliability of any facial recognition search depends on the quality of the probe image. Those materials identify "Poor Image Quality" as a condition that degrades facial recognition performance, and identify numerous conditions, such as low lighting, decreased sharpness, pose, expression, low resolution, and occlusion, that degrade both algorithmic performance and human review.

246. The Organization of Scientific Area Committees for Forensic Science ("OSAC") is the federal forensic science standards body, administered by the National

Institute of Standards and Technology and the U.S. Department of Justice. OSAC's Facial & Iris Identification Subcommittee develops consensus standards governing facial image capture, comparison, and use of facial recognition systems.

247.   OSAC's technical guidance reflects the forensic consensus regarding the minimum technical and procedural requirements for reliable operation of a facial recognition system. The framework states that inter-eye distance ("IED") is "a critical factor in successful operation" of facial recognition, and that current facial recognition systems "typically work better with a facial image that has between 64 to 128 pixels between the center of the subject's eyes." The framework further provides that the lower bound of that range is suitable only under ideal conditions, and that "non-ideal conditions may require a higher IED."

248.   The Pinellas County Sheriff's Office's materials demonstrate that probe images derived from surveillance footage, like that submitted to the FRT search in Mr. Dillon's case, are "poor quality" for facial recognition.

249.   The Facial Identification Scientific Working Group ("FISWG"), founded by the FBI, has separately promulgated consensus standards for facial image comparison. These include minimum guidelines for the documentation of facial image comparisons, minimum training criteria for facial recognition operators, standards for image processing in connection with automated facial recognition searches, and a standard guide for capturing facial images for use with facial recognition systems.

250.   The FISWG standards have been jointly recognized by major standards organizations, the American National Standards Institute ("ANSI") and ASTM

International. Among other things, the consensus is that the performance of a facial recognition system is heavily dependent on the quality of the probe image, untrained individuals are not recommended as facial recognition operators, and that quality assessment of the probe image by a qualified examiner is a precondition to any reliable facial recognition comparison.

## CLAIMS FOR RELIEF

### COUNT I

**Fourth Amendment Malicious Prosecution Under 42 U.S.C. § 1983**
**(Against Defendants O'Connell and Walters)**

251. Plaintiff realleges and incorporates by reference paragraphs 1–7, 10, 12, 14–43, and 57–202 as though fully set forth herein.

252. Defendants O'Connell and Walters caused Mr. Dillon to be seized pursuant to legal process—an arrest warrant—without probable cause, in violation of his Fourth Amendment right to be free from unreasonable seizure.

253. In swearing out the warrant affidavit, O'Connell intentionally, or with reckless disregard for the truth, included material misstatements and omitted known exculpatory evidence.

254. Had the misstatements been corrected and the omitted information included, no reasonable magistrate would have found probable cause to issue the warrant.

255. Walters submitted probe images to the FRT system without adequately assessing their quality, transmitted the result to O'Connell with a misleading

characterization of the results as a "93% match" and without disclosing information bearing on the search's limited reliability, and failed to include any caveat that the result was an investigative lead only. Walters' mischaracterization of the FRT result was at least reckless.

256.    Walters' use of the FRT system and his characterization of the search result was a central basis for the magistrate's probable cause finding.

257.    The prosecution terminated in Mr. Dillon's favor when all charges were dropped on October 24, 2024.

258.    Mr. Dillon's seizure would not have been authorized absent the constitutionally infirm warrant.

259.    As a direct and proximate result of O'Connell's and Walters's conduct, Mr. Dillon suffered the injuries and damages described herein.

## COUNT II

### *Monell* Liability Under 42 U.S.C. § 1983
### (Against Defendant City of Jacksonville Beach)

260.    Plaintiff realleges and incorporates by reference paragraphs 1–7, 10–11, 15–56, 63–82, 142–202, and 245–250 as though fully set forth herein.

261.    Mr. Dillon's Fourth Amendment rights were violated as set forth in Count I.

262.    Jacksonville Beach hired O'Connell despite his being terminated for threatening to "blow up" his prior agency and resigning under domestic battery charges, assigned him as lead investigator on a sensitive child-luring case without

52

enhanced supervision, and later promoted him after his investigation resulted in a wrongful arrest.

263. Jacksonville Beach's written FRT policy was facially deficient: it acknowledged that FRT results are investigative leads only but provided no operational guidance on corroboration, no probe image quality standards, no photo lineup safeguards following FRT use, no mandatory disclosures to magistrates, and no supervisory review requirements. The policy invited the very conduct it purported to prevent.

264. Jacksonville Beach failed to train its officers on the limitations and known failure modes of FRT, the doppelganger problem, the interaction between FRT and photo lineups, the obligation to disclose FRT use and limitations in warrant applications, and the obligation to include exculpatory evidence.

265. No supervisor reviewed O'Connell's investigation or warrant application during the more than eight months from the receipt of the FRT result to the submission of the warrant.

266. After the charges were dropped, Jacksonville Beach promoted O'Connell rather than investigating the wrongful arrest, retraining officers, or revising its FRT policies.

267. These failures in hiring, training, supervising, retaining, and policy were not isolated; they reflect a custom and practice of deliberate indifference to the foreseeable risk that officers would treat FRT results as conclusive identifications, and they were the moving force behind the deprivation of Mr. Dillon's Fourth Amendment

rights.

268.   As a direct and proximate result, Mr. Dillon suffered the injuries and damages described herein.

## COUNT III

### *Monell* Liability Under 42 U.S.C. § 1983
### (Against Defendant Waters)

269.   Plaintiff realleges and incorporates by reference paragraphs 1–7, 10, 13, 15–39, 44–56, 83–98, 182–190, and 203–250 as though fully set forth herein.

270.   Mr. Dillon's Fourth Amendment rights were violated as set forth in Count I.

271.   JSO accessed, operated, and disseminated the results of facial recognition searches for partner law enforcement agencies, including Jacksonville Beach PD. JSO personnel exercised judgment in submitting probe images, evaluating algorithmic output, and deciding what information to transmit to requesting agencies—judgments that directly shaped criminal investigations those agencies conducted.

272.   JSO maintained no adequate written policy governing the dissemination of facial recognition results to partner agencies. The absence of such a policy invited the very conduct it should have prevented.

273.   JSO failed to train its personnel—including Sergeant Walters—on FRT's limitations and known error rates, the importance of probe image quality, the proper characterization of results when communicating them to partner agencies, the dangers of language conveying unwarranted certainty, and the obligation to treat results as

investigative leads only.

274. No supervisor reviewed Sergeant Walters' submission of probe images to the FRT system, his evaluation of the algorithmic output, or his characterization of the result as "a 93% match on facial features" before it was sent to Jacksonville Beach PD.

275. After the charges against Mr. Dillon were dropped, JSO took no corrective action regarding Walters' handling of the search, conducted no review of its facial recognition dissemination practices, and adopted no policies to prevent recurrence.

276. These failures in policy, training, and supervision were not isolated; they reflect a custom and practice of deliberate indifference to the foreseeable risk that JSO personnel would transmit unreliable, misleadingly characterized facial recognition results to partner agencies, and that those results would be used to support constitutionally deficient arrest warrants. JSO's policies, customs, and practices were the moving force behind the deprivation of Mr. Dillon's Fourth Amendment rights.

277. As a direct and proximate result, Mr. Dillon suffered the injuries and damages described herein.

## **<u>REQUEST FOR RELIEF</u>**

Plaintiff respectfully requests the Court enter judgment in his favor and:

A. Award compensatory damages against all Defendants in an amount to be determined at trial for non-pecuniary injuries including pain, suffering,

humiliation, embarrassment, emotional distress, anxiety, and loss of enjoyment of life; and for pecuniary losses including bond costs, criminal defense attorney's fees, and lost income;

B. Award punitive damages against Defendants O'Connell and Walters in an amount sufficient to punish their knowing and reckless disregard of Plaintiff's constitutional rights and to deter similar conduct;

C. Declare that Mr. Dillon's arrest and prosecution was without probable cause in violation of the Fourth Amendment;

D. Order Defendants Jacksonville Beach and Waters to adopt and implement written policies, institute training, and adopt practices governing the use of facial recognition technology that include, at minimum, adequate safeguards to prevent future constitutional violations;

E. Award reasonable attorneys' fees and costs; and

F. Grant any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted July 13, 2026,

| | /s/ Nicholas L.V. Warren |
|---|---|
| Ira J. Lipton* | Nicholas L.V. Warren (FBN 1019018) |
| Siddartha Rao* | Daniel B. Tilley (FBN 102882) |
| Steven M. Silverberg* | **ACLU Foundation of Florida** |
| **Hoguet Newman** | 4343 West Flagler Street, Suite 400 |
| **Regal & Kenney, LLP** | Miami, FL 33134 |
| 60 East 42nd Street, 48th Floor | (786) 363-1769 |

New York, NY 10165
(212) 689-8808
ilipton@hnrklaw.com
srao@hnrklaw.com
ssilverberg@hnrklaw.com

*Special admission*

nwarren@aclufl.org
dtilley@aclufl.org

Nathan Freed Wessler*
Lauren J. Yu*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
nwessler@aclu.org
lyu@aclu.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that this document was served on counsel for the City of Jacksonville Beach and Jacksonville Sheriff T.K. Waters via CM/ECF, and on counsel for James Walters by email to Brett Mereness, brettm@coj.net.

/s/ Nicholas L.V. Warren
Nicholas L.V. Warren

*Counsel for Plaintiff*
